CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILE, VA
FILED
MAY 0 4 2012
JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:12CR00009-2 |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| LOIS LEE MCDANIEL, | ) | |
| | ) | |
| Defendant. | ) | By: B. WAUGH CRIGLER |
| | ) | U.S. MAGISTRATE JUDGE |

In accordance with the provisions of Title 28 U.S.C. § 636(b)(3), and upon the defendant's consent, this case was referred to the undersigned to conduct a plea hearing.

**DEFENDANT'S RESPONSES TO RULE 11 INQUIRY**

The Grand Jury returned a multiple-count Indictment charging defendant in Count One with knowingly and intentionally combining, conspiring, and agreeing to possess with the intent to distribute and to distribute: prior to October 21, 2011, a mixture or substance containing a detectable amount of MDMC, MDPV and 4-MEC, controlled substance analogues as defined in Title 21, United States Code, Section 802 (32), with intent for human consumption as provided in Title 21, United States Code, Section 813, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); and (2) from October 21, 2011 and continuing to the date of the indictment, a mixture or substance containing a detectable amount of MDMC and MDPV, Schedule I controlled substances (by Final Order of DEA, 76 Fed. Reg. 65371), and 4-MEC, a controlled substance analogue as defined in Title 21, United States Code, Section 802(32), with intent for human consumption as provided in Title 21, United States Code, Section 813, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), all in violation of Title 21, United States Code, Section 846; in Count Two with knowingly and intentionally distributing a mixture or substance containing a detectable amount of MDPV, a controlled substance analogue as defined in Title 21, United States Code, Section 802 (32), knowing the substance was intended for human

consumption as provided in Title 21, United States Code, Section 813, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); in Count Three with knowingly and intentionally distributing a mixture or substance containing a detectable amount of MDPV, a controlled substance analogue as defined in Title 21, United States Code, Section 802 (32), knowing the substance was intended for human consumption as provided in Title 21, United States Code, Section 813, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); in Count Five with knowingly and intentionally distributing a mixture or substance containing a detectable amount of MDPV and MDMC, controlled substance analogues as defined in Title 21, United States Code, Section 802 (32), knowing the substances were intended for human consumption as provided in Title 21, United States Code, Section 813, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); in Count Six with knowingly and intentionally distributing a mixture or substance containing a detectable amount of 4-MEC, a controlled substance analogue as defined in Title 21, United States Code, Section 802 (32), knowing the substance was intended for human consumption as provided in Title 21, United States Code, Section 813, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); in Count Seven with knowingly and intentionally distributing a mixture or substance containing a detectable amount of MDPV and MDMC, controlled substance analogues as defined in Title 21, United States Code, Section 802 (32), knowing the substances were intended for human consumption as provided in Title 21, United States Code, Section 813, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C); and in Count Eight with knowingly and intentionally distributing and possessing with the intent to distribute a mixture or substance containing a detectable amount of MDPV and MDMC, controlled substance analogues as defined in Title 21, United States Code, Section 802 (32), knowing the substances were intended for human consumption as provided in Title 21, United States Code, Section 813, all in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C).

On April 26, 2012, a plea hearing was conducted before the undersigned. The defendant was placed under oath and testified that her full legal name is Lois Lee McDaniel, she was born on March 26, 1958, and she made it to the tenth grade in high school. The defendant stated that she can read, write, and understand the English language. The defendant further stated that she was fully aware of the nature of the charges against her and the consequences of pleading guilty to those charges. The defendant informed the court that she suffers with diabetes, high blood pressure, high cholesterol, fibroidal tumors, neuropathy, a nervous disorder, and depression, and that she is taking numerous medications for the conditions. Even so, she stated that nothing impaired her ability to understand what the court was saying or the nature of the proceedings. The defendant testified that she had received a copy of the Indictment pending against her, and that she had fully discussed the charges therein and any defenses thereto, and her case in general, with her counsel. The defendant stated that she was pleading guilty of her own free will because she was, in fact, guilty. The defendant testified that she understood that Count One is a felony, and if her plea is accepted, she will be adjudged guilty of that offense. The defendant acknowledged awareness that if she complies with the plea agreement, the government has agreed to move for her dismissal from the remaining counts of the Indictment.

The defendant acknowledged that the maximum statutory penalty for Count One is a $1,000,000 fine and/or imprisonment for a term of twenty years, together with a term of supervised release. The defendant was informed that parole has been abolished, and that if she is sentenced to prison, she will not be released on parole, but on supervised release, a violation of which could result in additional incarceration. Finally, the defendant testified that she understood that, upon conviction, she will be required to pay a mandatory assessment of $100 per felony count of conviction.

The defendant was informed that under the Sentencing Reform Act of 1984, the United States Sentencing Commission has issued guidelines for judges to follow in determining the

3

sentence in a criminal case. The defendant was then informed that the Sentencing Guidelines are no longer mandatory, but the sentencing judge may apply them in an advisory fashion in determining a reasonable sentence. The defendant testified that she and her counsel had discussed how the Sentencing Guidelines might apply in her case. The defendant also testified that she understood that the court would not be able to determine the applicable guideline range, for advisory purposes, until after a presentence report has been prepared and both parties have been given an opportunity to challenge the reported facts and application of the Guidelines. The defendant stated that she understood that the eventual sentence imposed may be different from any estimate her attorney had given her, or any recommendation by the government, and that the court has the authority to impose a sentence that is either higher or lower than that called for by the Guidelines, so long as the sentence is not greater than the statutory maximum for the offense to which the defendant is pleading guilty.

    The defendant acknowledged it was agreed that the 2011 edition of the United States Sentencing Guidelines Manual is applicable. The defendant further acknowledged that, in the Plea Agreement, it had been stipulated that Sentencing Guidelines 2D1.1 and 3B1.1 are applicable to her conduct. The defendant also stated that she understood that even if she fully cooperates with law enforcement, the government is under no obligation to file a motion to reduce her sentence for substantial assistance, and if the government makes the motion, it is up to the court to determine how much of a departure, if any, should be made. The defendant stated that she understood that, contingent upon her acceptance of responsibility and continued cooperation in the sentencing process, and fulfillment of her duties under the Plea Agreement, the government will recommend a two-level (2) reduction under USSG § 3E1.1(a), and, if applicable, the government will move that she be given an additional one-level (1) reduction under USSG § 3E1.1(b). The defendant agreed that she had knowingly and voluntarily waived her rights to request or receive any records pertaining to the investigation or prosecution of her

4

case, including any records that may be sought under the Freedom of Information Act or the Privacy Act of 1974. The defendant agreed she would submit a financial statement, if called upon to do so. She further agreed that from the time of her signing of the plea agreement, or the date she signs the financial statement, whichever is earlier, she would not convey anything of value without authorization from the government. The defendant acknowledged her monetary obligations under the plea agreement, which calls for such to be due immediately and subject to immediate enforcement.

The defendant acknowledged that she was waiving her right to have a jury determine beyond a reasonable doubt the facts alleged in the Indictment, including any facts related to sentencing. The defendant testified that she understood that she had the right to a trial by a jury, in addition to the following rights, which will be waived or given up if her guilty plea is accepted:

1. The right to plead not guilty to any offense charged against her;
2. The right at trial to be presumed innocent and to force the government to prove her guilt beyond a reasonable doubt;
3. The right of assistance of counsel at trial and in any subsequent appeal;
4. The right to see, hear and cross-examine witnesses;
5. The right to call witnesses to testify on her own behalf and to the issuance of subpoenas or compulsory process to compel the attendance of witnesses;
6. The right to decline to testify unless she voluntarily elects to do so in her own defense;
7. The right to a unanimous guilty verdict; and
8. The right to appeal a guilty verdict.

The defendant testified that she understood that, under the terms of the agreement she was waiving her rights to appeal, but that she was not waiving her right to appeal or have her attorney file a notice of appeal as to any issue which cannot by law be waived. The defendant stated she was aware that the government had retained its rights to appeal. The defendant acknowledged that she

had agreed to waive her right to collaterally attack any order issued in the case, unless such attack is based on ineffective assistance of counsel.

The defendant testified that she understood that she may be deprived of valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury, and the right to possess a firearm. The defendant stated that she was satisfied with the advice and representation given to her in this case by her counsel, and that she believed the representation had been effective. The defendant asked the court to accept her plea of guilty to Count One.

**THE GOVERNMENT'S EVIDENCE**

The evidence presented in the government's Factual Summary is as follows: The offense(s) described below occurred within the Western Judicial District of Virginia. This Statement of Facts briefly summarizes the facts and circumstances surrounding the defendant's criminal conduct. It does not necessarily contain all the information obtained during this investigation and applicable to an accurate Presentence Report and Sentencing Guidelines calculation.

"Bath Salts" first emerged in the United States approximately two years ago. Since then, the use of "bath salts" has increased dramatically, particularly among adolescents and young adults, and has been linked to overdoses, suicides, and deaths throughout the United States. According to the American Association of Poison Control Centers, from January 1, 2011 to December 2011, poison control centers across the United States received 6,138 calls regarding "bath salt" abuse, compared to 302 calls during 2010.

"Bath salts" are mixtures of many different chemicals, including those that resemble cocaine, methamphetamine, and ecstasy. They are classified as synthetic cathinones which are central nervous system stimulants. They are chemically similar to cathinone, a Schedule I controlled substance that occurs naturally in the khat plant (*Catha edulis*). Users of "bath salts" typically snort the drug in

6

Case 3:12-cr-00009-GEC Document 72 Filed 05/04/12 Page 6 of 12 Pageid#: 162

powder form or ingest the drug in pill form, but some users have been known to smoke it, or inject the drug intravenously. A typical user amount of "bath salts" is one half of a gram to one gram. The drug has proven to affect users in a variety of ways, but users typically experience highs similar to those experienced after ingesting MDMA or "ecstasy" (heightening of the senses and sexual arousal), and stimulants like cocaine and methamphetamine (euphoria and increased energy). "Bath salts" have been known to have a number of adverse effects, which include psychotic episodes, violent behavior, delusions, panic attacks, increased heart rate, chest pain, agitation, dizziness, nausea and vomiting.

Packets of "bath salts" are commercially branded with a variety of names and are often labeled "not for human consumption" in an effort to circumvent the federal narcotics laws. See attached Exhibit A. Despite these warnings, the sellers of "bath salts" have marketed these substances to consumers as recreational drugs.

In early April of 2011, a family member of an individual addicted to "bath salts" came to the Jefferson Area Drug Enforcement Task Force (JADE) office and notified detectives that "bath salts" were a new illegal drug and were being sold and used in the Charlottesville community. The individual further stated that this substance had horrible physical and psychological side effects and was destroying a member of her family. JADE followed up with the individual's family members and developed a plan to attempt to begin making controlled purchases of this substance. Detectives identified the C'ville Video Store located on 5th Street in Charlottesville, Virginia as a location selling "bath salts." Prior to this investigation there had been no state or federal investigations in the Charlottesville area concerning "bath salts." JADE, utilizing a confidential informant, made a series of controlled buys from the C'ville Video Store. JADE sent the purchased substances to the state lab

7

in an attempt to document the chemical composition and determine its legality. The substances in the "bath salts" packages purchased by the JADE informant were identified by a chemist at the Division of Forensic Science as: 3,4-Methylenedioxymethcathinone ("MDMC"), 3,4-Methylenedioxypyrovalerone ("MDPV"), and 4-Methyl-ethylcathinone ("4-MEC").

After receipt of the lab results and after consulting with the Charlottesville Commonwealth Attorney's Office, JADE sought the assistance of the federal Drug Enforcement Administration (DEA) and the United States Attorney's Office for the Western District of Virginia for more information on the substances and how the investigation should proceed. Because of the threat to public safety, a decision was made to commit federal resources to the investigation and attempt to determine from where the "bath salts" sold from the C'ville Video Store came.

The subsequent investigation revealed that Lois Lee MCDANIEL owns and operates the C'ville Video Store located on 5th Street in Charlottesville, Virginia. Shortly after purchasing the video store in 2011 she began selling "bath salts." MCDANIEL purchased the "bath salts" from a supplier in New York. The supplier advertised himself as a seller of "bath salts" on the internet. MCDANIEL would call the supplier's cell phone number to place orders for "bath salts." The supplier would inform MCDANIEL which varieties of "bath salts" he had in stock and she would choose from the different product options when ordering. The supplier often described which types of his current product options provided the best high or which one most resembled other drugs, including cocaine and ecstasy. MCDANIEL had the supplier send the shipments of "bath salts" to the C'ville Video Store via Federal Express. MCDANIEL would then send a money order from the Food Lion grocery store located next to C'ville Video on 5th Street to the supplier in New York.

MCDANIEL, along with two others, would sell the "bath salts" out of the C'ville Video

8

Case 3:12-cr-00009-GEC   Document 72   Filed 05/04/12   Page 8 of 12   Pageid#: 164

Store from behind the counter. The transactions were typically not run through the cash register. The product was at first located on top of the counter in a display case, but was later concealed under the counter in a bag in a trash can. There was often a line of "bath salts" users outside the door of C'ville Video in the morning before it opened. MCDANIEL and two others were involved in hand to hand sales to JADE confidential informants.

Specifically, between April 2011 and August 2011 JADE, with the assistance of DEA-Richmond, conducted five separate controlled "bath salts" buys from the video store. These buys were conducted on April 21, 2011 (1.092 grams of 3,4-Methylenedioxypyrovalerone which is commonly referred to as MDPV), April 25, 2011 (0.299 grams of MDPV), May 2, 2011 (0.917 grams of MDPV), July 25, 2011, (3.3 grams of MDPV, 0.88 grams of 4-Methyl-ethylcathinone which is commonly referred to as 4-MEC, and 0.83 grams of 3,4-Methylenedioxymethcathinone which is commonly referred to as Methylone or MDMC) and August 11, 2011 (1.25 grams of MDPV). If MCDANIEL was not physically present at the store to make the sale herself, the two others would call her cell phone to receive permission to conduct the sale. All transactions were captured on audio and video recording equipment.

Under Federal law these three substances, MDPV, MDMC, and 4-MEC, were not Schedule I controlled substances at the time of these controlled buys from MCDANIEL. When a substance does not appear on the DEA controlled substance list it is possible that such substance is controlled substance analogue. Title 21 United States Code Section 813, states that "a controlled substance analogue shall, to the extent intended for human consumption, be treated, for the purposes of any Federal law as a controlled substance in schedule I." A substance is a controlled substance analogue according to Title 21 United States Code Section 802(32) if-

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II; and

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

All substances from the five controlled buys were sent to the DEA lab in Baltimore, Maryland. In declarations dated February 1, 2012, Thomas DiBerardino, Ph.D, a DEA chemist, found that the chemical structure of the submitted MDPV and 4-MEC was substantially similar to the chemical structure of methcathinone, a Schedule I controlled substance. He also found that the chemical structure of the submitted MDMC was substantially similar to the chemical structure of MDMA (commonly referred to as ecstasy), a Schedule I controlled substance. Additionally, in declarations dated February 6, 2012, Cassandra Prioleau, Ph.D., a DEA Drug Science Specialist, found that the pharmacological effects on a user's central nervous system of the submitted MDPV and 4-MEC was substantially similar or greater than the pharmacological effects on a user's central nervous system of methcathinone, a Schedule I controlled substance. She also found that the pharmacological effects on a user's central nervous system of the submitted MDMC was

substantially similar or greater than the pharmacological effects on a user's central nervous system of MDMA (commonly referred to as "ecstasy"), a Schedule I controlled substance.

In late August of 2011 JADE detectives and a DEA agent went to the C'ville Video Store and confronted Lois MCDANEIL about selling the "bath salts." Lois MCDANIEL admitted her involvement in selling the "bath salts" and consented to a search of the video store. MCDANIEL stated that she was responsible for placing all orders with her New York supplier and arranged to always have a supply of "bath salts" at the C'ville Video Store. MCDANIEL stated that she knew individuals were using the substances to get high and that she should not have been selling them. She also admitted that she represented to customers that the use of the substances she was selling would have an effect on the customer that was substantially similar to the use of a controlled substance. From this point forward MCDANIEL began cooperating with law enforcement officers.

MCDANIEL'S version of how her operation was run was corroborated by the investigation and statements of the co-conspirators. In total, Lois MCDANIEL was involved in the importation of at least 200 grams of "bath salts."

**FINDINGS OF FACT**

Based on the evidence presented at the plea hearing, the undersigned now submits the following formal findings of fact, conclusions and recommendations:

(1) The defendant is fully competent and capable of entering into a plea agreement and making an informed plea;

(2) The defendant is aware of the nature of the charges and the consequences of her plea;

(3) The defendant knowingly and voluntarily entered a plea of guilty to Count One of the Indictment; and

(4) The evidence presents an independent basis in fact containing each of the essential elements of the offense to which the defendant is pleading guilty.

**RECOMMENDED DISPOSITION**

Based upon the above findings of fact, the undersigned RECOMMENDS that the court accept the defendant's plea of guilty to Count One of the Indictment. The undersigned DIRECTS that a presentence report be prepared. A sentencing hearing hereby is scheduled for July 26, 2012 at 9:30 a.m. before the presiding District Judge in Charlottesville.

**NOTICE TO PARTIES**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C): Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. The presiding District Judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The presiding District Judge may accept, reject, or modify, in whole or in part, the findings or recommendations made by the undersigned. The judge may also receive further evidence or recommit the matter to the undersigned with instructions.

Failure to file timely written objections to these proposed findings and recommendations within fourteen days could waive appellate review. At the conclusion of the fourteen-day period, the Clerk is directed to transmit the record in this matter to the presiding United States District Judge.

The Clerk is hereby directed to send a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: _____
United States Magistrate Judge

5/4/12
Date